1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  RICKY RENE LUCERO,                    1:12-cv-00614-LJO-BAM (HC)

10              Petitioner,              FINDINGS AND RECOMMENDATION
                                         REGARDING PETITION FOR WRIT OF
11      v.                               HABEAS CORPUS

12                                       [Doc. 1]
     R.H. TRUMBLE,
13
                    Respondent.
14  _____/

15

16      Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28

17  U.S.C. § 2254.

18      On July 2, 2009, following a jury trial in the Tulare County Superior Court Petitioner was

    convicted of kidnapping to commit robbery, one county of robbery, assault with a firearm, assault
19
    with a deadly weapon, and conspiracy to commit robbery.  It was further alleged and found true
20
    that Petitioner personally inflicted great bodily injury, the crimes were committed for the benefit
21
    of a criminal street gang, and property taken was in excess of $50,000.  It was also found true
22
    that a principal in the kidnapping to commit robbery, robbery, and conspiracy to commit robbery
23
    used firearm and such allegation applied to all co-defendants, such as Petitioner, for whom the
24
    gang allegation was found true.
25
        On August 20, 2009, Petitioner was sentenced to life in prison with a minimum of fifteen
26
    years before eligibility for parole on count one (kidnapping to commit robbery), plus a
27
    consecutive ten years for the firearm enhancement, a consecutive three years for the great bodily
28

1

injury enhancement, and a consecutive three years for the great bodily injury enhancement.  On count two (robbery), Petitioner was sentenced to a total term of sixteen years, stayed as follows: three years, the mid-term, with a consecutive ten years for the firearm enhancement, and a consecutive three years for the great bodily injury enhancement.  The sections 12022.6 and 186.22 enhancements were stayed.  On count three (assault with a firearm), Petitioner was sentenced to a total term of eight years, stayed as follows: three years, the mid-term, with a consecutive five years for the gang enhancement.  On count four (assault with a deadly weapon), Petitioner was sentenced to a total term of thirteen years, stayed as follows: three years, the mid term, with a consecutive ten years for the gang enhancement.  The section 12022.7 enhancement was stayed.  On count five (conspiracy to commit robbery), Petitioner was sentenced to a total term of thirteen years, stayed as follows: three years, the mid term, with a consecutive ten years-for the firearm enhancement.  The sections 186.22, 12022.6, and 12022.7 enhancements were stayed.

On March 23, 2011, the California Court of Appeal, Fifth Appellate District, modified Petitioner's sentence in count one to reflect an indeterminate term of life in prison and a determinate term of ten years for the firearm enhancement.  The judgment was affirmed in all other respects.  Petitioner petitioned for rehearing, and on April 21, 2011, the court issued an Order Modifying Opinion and Denying Petition for Rehearing, modifying only some of the language in the opinion.  (Ex. B. to Answer.)

On July 13, 2011, the California Supreme Court denied Petitioner's Petition for Review.

On February 15, 2012, the California Court of Appeal, Fifth Appellate District, denied Petitioner's Petition for Writ of Error Coram Nobis.

Petitioner filed the instant petition for writ of habeas corpus on April 18, 2012.  Respondent filed an answer to the petition on August 1, 2012.  Petitioner did not file a traverse.

////

1

<u>STATEMENT OF FACTS</u>[1]

2

Around 9:55 p.m. on Friday, January 25, 2008, Yassen Saeed (Yassen), the manager of the N & S Chevron store near Porterville, was preparing to close the store. Yassen was cleaning the fountain drink area, and his back was to the store's front door and windows. The store's front windows faced the parking lot. There were no customers in the store. Yassen's coworker, David Santoyo (David) was outside, cleaning the parking lot.

Yassen heard the store's front door open and turned around. Four men ran into the store and rushed up to him. One man held a metallic revolver, another man had some type of gun, and a third man had a baseball bat. Yassen could not see their faces because they were wearing masks and hoods. The men pointed the guns at Yassen's head, swore and cursed at him, and ordered him to get down on the floor. Yassen immediately got on the floor and did not resist.

The two gunmen ordered Yassen to go to the back of the store. Yassen obeyed and crawled on the floor. The men pushed him to the store's rear storage area, which was not open to the public. Yassen did not hear the men shout any gang names or gang slogans. When Yassen reached the back of the store, his last memory was seeing the "guy with . . . the baseball bat." Yassen was hit in the head with the baseball bat and passed out.

When Yassen regained consciousness, he was disoriented and lying in a pool of blood at the back of the store. Yassen discovered that $800 of his own money was missing from his back pocket. The store's office was adjacent to the storage room, and the office door had been closed and locked. The store kept a large amount of cash in that office on Friday nights to cash customers' payroll checks for the weekend. Yassen discovered the office door was open, the safe and cabinet which contained the store's case were also open, and over $160,000 had been taken. The store's cash registers had not been disturbed.

**The parking lot**

At the time of the robbery, David, Yassen's coworker, was cleaning the parking lot and did not realize what was going on in the store. However, David noticed a silver Mitsubishi was parked behind the store. The driver was wearing a hooded sweatshirt and was the only person in the car. One or two minutes later, David saw the car drive away from the store at a slow speed. The car's headlights were not on. The car passed by David as it left the parking lot, and David saw two or three more people in the car.

At about the same time, a customer drove up to the store and saw a silver Mitsubishi "flying out" of the parking lot. The customer and David found Yassen walking around outside, and he was "busted up" and bleeding.

*///*

---

[1] The following summary of facts are taken from the opinion of the California Court of Appeal, Fifth Appellate District appearing as Exhibit A, of the Answer to the Petition for Writ of Habeas Corpus, which is presumed correct. 28 U.S.C. § 2254(e)(1).

Yassen suffered a skull fracture and he was in the hospital for one week. He repeatedly suffered seizures as a result of his head injuries. He was placed on various medications, but his seizures were so serious that he could not return to work.

**The investigation**

The investigating officers found a pool of blood in the store's rear hallway. The distance from the fountain drink area to the pool of blood was 33 feet.

The store had a closed-circuit videotape system with multiple cameras. Fidel Saeed (Fidel), Yassen's cousin, was also a clerk at the store, and he watched the surveillance videotape of the robbery. Fidel immediately recognized one of the masked robbers as Michael Santoyo (Michael), David's brother and the store's former assistance manager, based on the distinctive way Michael walked and carried himself. Michael's face was partially visible above his mask.

Yassen and Michael had been good friends, and they had worked together at the Porterville store for several years. About a month before the robbery, Michael borrowed the store's truck and wrecked it, and he did not return to his job. David continued to work at the store after Michael left.

Yassen testified that Michael knew the store kept a large amount of cash in the back office on Friday nights. The office door was usually locked, but Yassen and Michael kept a little knife next to the door, on top of the power box, and they used that knife to pry open the door if they forgot the key.

Michael's trial testimony [FN 4]

> FN 4. Michael voluntarily testified as a prosecution witness, without a plea agreement, even though charges were still pending against him. Michael had been offered a plea agreement with a maximum of 22 years and turned it down.

Michael testified for the prosecution and admitted his involvement in the robbery. Michael testified he told his girlfriend, Felecia Hernandez (Felecia), about the large amount of money that was kept at the store to cash checks. He also told Felecia that the store owed him. Felecia told her brother, Francisco, about the cash. Francisco said he was going to get his friends together to rob the store and asked Michael more questions about the store.

Michael testified the robbery was Felecia's idea. Felecia kept telling Michael that Francisco would do something bad to him if he did not go through with the robbery. Michael warned Francisco that he would be recognized on the store's video cameras since he used to work there. Francisco told Michael not to worry, and that he had people who would take care of Michael if he was locked up.

Michael testified he was not a member of the Fresno Bulldogs gang. However, Michael knew that Francisco was a member of a gang and he was known as "Bandit." Michael was afraid of Francisco because of things he had heard about Francisco and his friends.

On the day of the robbery, Francisco repeatedly called Michael and told him to pick up [Petitioner]. Michael knew [Petitioner] used to date Felecia, and that [Petitioner] and Francisco were good friends. [Petitioner] told Michael that they called themselves the "Primos" gang, and [Petitioner] had a dog paw tattoo.

Around 8:00 p.m. on the night of the robbery, Michael and Felecia were in Michael's black car and they picked up [Petitioner] Michael drove Felecia and [Petitioner] to the Fresno apartment where Francisco lived with his girlfriend, Celena Gonzales (Celena). Francisco was there with several other men. Francisco told Michael that they were going to rob the store that night.

Michael testified he got into his black car with Felecia. Francisco, [Petitioner], Benjamin, and Johnson got into Celena's silver car. Francisco had a silver revolver. Michael drove to Porterville, and the silver car followed him. Michael knew he was going to Porterville to rob the store with Francisco, [Petitioner], Benjamin, and Johnson. Michael testified they used two cars so they could use one car for the robbery, and the other car for the escape.

Michael stopped at an orange grove about a half mile from the store, and the other men arrived in the silver car. Michael, [Petitioner], Francisco, Benjamin, and Johnson got into the silver car and headed to the store, while Felecia stayed behind in the black car. Michael saw a baseball bat inside the silver car.

Michael drove the silver car to the store and parked on the side of the building. Both Francisco and Johnson had handguns, and [Petitioner] had the baseball bat. Michael did not realize his brother David was working at the store that night.

Michael stayed outside the store while Benjamin, Francisco, [Petitioner], and Johnson entered the front door. Michael hesitated and then he entered the store. Michael wore a mask but it did not completely cover his face. Michael walked to the back of the store and found Yassen lying on the hallway floor, moaning and holding his head. Francisco and [Petitioner] were standing next to Yassen, and Francisco had a handgun. One of the men told Michael to get the money. Michael walked past Yassen, used the knife to open the office door, and took the cash from the office.

Michael walked out of the store's back door. Francisco pulled up to the back door in the silver car and Michael got in. [Petitioner], Benjamin, and Johnson were in the store for a few more minutes, and then they walked out of the back door and got into the car. Francisco drove away from the store at a fast speed.

Michael testified Francisco drove the silver car to meet Felecia, who was still waiting in the black car. Francisco put the masks, guns, and cash in the trunk of the black car. Francisco told Felecia to leave in the silver car. Michael and the men got into the black car, and Francisco told Michael to take back roads to Fresno.

Michael drove the men to [Petitioner's] house in Fresno, and Felecia met them there. Francisco took the guns and money out of the car, and everyone went into [Petitioner's] house. Michael testified that [Petitioner's] girlfriend was also there. Francisco counted the robbery money in the presence of [Petitioner], [Petitioner's] girlfriend, Felecia, Benjamin, and Johnson. Michael thought they stole about $130,000. Francisco divided the robbery proceeds and gave $20,000

5

to each man, including himself.  Francisco gave the rest of the money–about $50,000–to Michael and Felecia.

Later that night, Felecia dropped off some of the money with her cousin. Michael and Felecia kept the rest of the money and drove to Stockton.  However, Michael started to receive cell phone calls and text messages from other store employees who said they knew Michael committed the robbery.  Michael learned the police were looking for them.

Michael testified that he decided to call the police.  Felecia told Michael to say they were in Sacramento and were not involved in the robbery.  Michael and Felecia separately met with the police.  Michael initially told Detective Pinion that he was not involved in the robbery and gave the story that Felecia had suggested. Pinon advised him that Felecia had already revealed the names of the robbery participants and they were all in custody.  Michael confessed to his involvement.

**Felecia's trial testimony** [FN 5]

> FN 5. Felecia pleaded guilty to kidnapping and conspiracy to commit robbery, with a maximum term of nine years, and she agreed to testify truthfully for the prosecution pursuant to her plea agreement.

Felecia also testified for the prosecution and offered a slightly different story.  Felecia denied pressuring Michael into participating in the robbery or forcing him to tell others about the money at the store.  Felecia testified that Michael told her the Chevron store had lots of money on Fridays and Saturdays, and they "owed" him.  Felecia asked Michael if he was sure that he wanted to do it.  Michael said that if he could not get Francisco and his friends to perform the robbery, he would find someone else to do it.

Felecia knew Francisco and [Petitioner] were friends.  She knew Francisco was a member of the Fresno Bulldogs, he had gang-related tattoos, and he was called "Strange One" and "Bandit."  Felecia had dated [Petitioner] several years earlier, and she suspected [Petitioner] was a member of the Fresno Bulldogs because he had a "Bulldogs" tattoo on his hand. [Petitioner] used the nicknames "Mix" and "Little Loony."  Johnson was Felecia's cousin.

Felecia testified the group planned to commit a robbery in Porterville instead of Fresno, because she was worried their group would be known in Fresno.  They planned the robbery a few hours before it happened when they were at Celena's house in Fresno.  Celena, Michael, Benjamin, and another man were at the house.  Felecia testified she stayed in the house while the others went outside to talk about the robbery. [Petitioner] was not initially there, but he arrived later.

After the meeting at Celena's house, Felecia drove Michael's black car to Porterville, and [Petitioner], Michael, Francisco, Benjamin, and Johnson followed in a silver car.  They followed Michael's directions and met in a certain location away from the store.  The men left in the silver car and Felecia knew they were going to rob the store.  She stayed behind and waited in the black car.

After the robbery, the men met Felecia and they exchanged cars.  Felecia drove the silver car back to Fresno and met the men at [Petitioner's] house.

6

[Petitioner], Johnson, Benjamin, and Michael were there.  Michael had the money from the robbery, but Felecia claimed she was not present when the money was counted and distributed.

Felecia and Michael left [Petitioner's] house, and she gave some of the money to her cousin.  Michael became nervous when he received a telephone message from "his old boss" that the police wanted to talk to him.  Michael told Felecia what to say if they were caught.  Felecia told him that they needed to get rid of the money.  Felecia put the money in a purse and hid the purse in the bushes.

Felecia admitted that she initially lied to Detective Pinon when he asked her about the robbery. Felecia decided to tell the truth after she learned the store clerk had been injured and could die, and that she could be charged with murder and go to prison. She identified defendant, Francisco, Johnson, Michael, and Benjamin as the robbers. Felecia also showed the officers where she threw the bag of money in the bushes, and it contained nearly $11,000.

**Celena's trial testimony**

Celena was Francisco's girlfriend. Celena testified that defendant, Francisco, Benjamin, Johnson, Michael, and Felecia met at her apartment on the evening of the robbery. [FN6] The group left in a black car and in Celena's silver car. Celena thought they were going to a party. Felecia drove the silver car, and Celena thought defendant was in one of the vehicles. Celena did not go with them.

> FN6. Detective Pinon testified that when he initially interviewed Celena, she did not mention that defendant was at her house on the night of the robbery. Celena said she did not know anything about the robbery until she found out her silver car was in a tow yard. (RT 789–790)

**The searches and arrests**

Michael and Felecia directed the officers to the Fresno residences associated with defendant, Benjamin, and Johnson, and officers searched those locations. The officers found large amounts of cash and gang paraphernalia at the homes associated with Johnson and Benjamin.

At 4:30 a.m. on January 27, 2008, just two days after the robbery, officers searched the residence of defendant's grandmother. Defendant lived there and was taken into custody. The officers found several pieces of evidence in a particular bedroom: a Fresno Bulldog T-shirt, baseball cap, and a blanket displayed on the wall; types of gang writing; a baseball bat; and two crowbars. The Bulldog apparel and writings were consistent with gang indicia. The officers also found over $15,000 hidden in the same bedroom. Some of the cash was in a wallet, which contained defendant's identification card. The officers found additional cash in a dresser, along with a letter addressed to defendant.

After the robbery, Francisco, Celena, and Johnson escaped to Texas, and they lived there for about one month. Francisco and Johnson were later arrested in Texas.

///

# DEFENDANT'S POSTARREST INTERVIEW

Several hours after defendant was arrested, Detective Camacho conducted a tape-recorded interview with him. Defendant was advised of and waived his constitutional rights and agreed to answer questions. The audiotape was played for the jury.

Detective Camacho advised defendant about the facts of the robbery. Defendant initially denied any involvement and asked if someone was "pointing fingers" at him. Camacho explained he had some information that defendant was at the store. Camacho asked if he had friends named Benjamin, Francisco, and Johnson. Defendant said he recently met Benjamin, he "barely" knew Johnson, and he knew Francisco better.

Camacho asked defendant if he was "a bulldog," and defendant said yes. Defendant said his nickname was "Little mini boy."

Camacho asked defendant if Francisco gave him some cash to hold. Defendant said Francisco gave him a little money. Camacho advised defendant that the officers found over $10,000 at his grandmother's house. Defendant said "a homie" gave him that money about a week ago.

Camacho advised defendant about the circumstances of the robbery, the manner in which the clerk was beaten, and the clerk's serious injuries. Camacho asked defendant if he went to the store just for the money or to hurt someone. Defendant replied, "I didn't try to kill nobody." Camacho asked defendant how many times he hit the clerk with the baseball bat, and advised him the entire incident was on the store's surveillance videotape. Defendant replied, "Only like two, three," and "I was trying to aim for his back." Defendant said he did not intentionally hit the clerk in the head, and he did not try to kill him. Defendant thought the clerk moved and that is why he was hit in the head.

Camacho asked defendant why he was involved in the robbery. Defendant said some guy said "it was easy," but he did not know who said that, and he did not know anyone named Michael. Defendant said he went to Porterville in a silver car. Defendant said he hit the clerk with the baseball bat when they were in the back of the store, and another guy took the money. They left the store in the silver car.

Defendant asked Camacho, "Who ratted me out?" Camacho would not tell him, but urged defendant to identify the other suspects because they were not covering up for him. Camacho asked defendant to identify the driver of the getaway car. Defendant said he did not know if "Felecia's man" was driving the car. Camacho asked defendant if he was afraid of Francisco, and defendant said no. Camacho again asked defendant who was driving the getaway car, and defendant refused to say. Defendant admitted they switched cars with Felecia they returned to Fresno in a black car.

Defendant eventually changed his story about the money. He admitted they went to his grandmother's house after the robbery. He took about $17,000 as his cut, and that was the cash the officers found at his grandmother's house.

Camacho asked defendant if Felecia was with them during the robbery. Defendant refused to answer. Camacho asked defendant how he would plead if he was charged with robbery, and defendant said he was guilty.

Camacho testified that defendant was very polite, calm, and respectful during the interview. Camacho showed defendant a still photograph from the store's surveillance videotape, which depicted one of the robbers holding a baseball bat. Defendant said that he was the person with the baseball bat. Defendant refused to identify the other suspects. Camacho asked defendant if he was interested in writing a letter of apology to the person who was hurt during the robbery. Defendant said yes. Defendant wrote a note "to whom it may concern," apologized for his role in the robbery, apologized for hurting someone so seriously, wrote that he did not mean to hurt him, and he signed it.

## TESTIMONY OF PROSECUTION'S GANG EXPERT [FN7]

FN7. We will extensively review Detective Yandell's testimony because defendant raises numerous challenges to the admissibility and foundation for his opinions about the Fresno Bulldogs.

Tulare County Sheriff's Deputy Yandell testified as the prosecution's gang expert. Yandell had been a peace officer for nine years, and a detective with the sheriff's department Gang Violence Suppression Unit for a little less than two years. He was responsible for investigating gang aspects of criminal cases in Tulare County, participating in proactive patrols in areas with high gang violence, contacting and identifying gang members, debriefing gang members about their criminal activities, monitoring inmate calls from the jail and gang Internet sites, and monitoring gang trends in Tulare County and surrounding counties.

Yandell was a member of Tulare County's multiagency gang enforcement team, the California Gang Investigators Associations, and the Tulare County Gang Task Force. He shared information with other gang experts and kept up to date with the habits of gang members in the area.

Yandell had participated in investigations into gang-related offenses including murder, attempted murder, felony assault, vandalism, drug sales, and jail assaults. He had authored two search warrants and participated in executing over 25 search warrants for gang-related evidence.
Yandell had taken classroom courses and video training on northern criminal street gangs, Hispanic gangs, white power gangs, prison gangs and their street influence, Asian gangs, and the Fresno Bulldogs. He also worked at the main jail for four years, and had gang-related experiences there by interacting with and classifying gang members in a custodial setting. He believed gang members were more honest about their membership while in custody because of the implications of being housed with rival gang members.

Yandell had qualified as a gang expert ten times in Tulare County and authored at least 12 opinions in the last two years as to whether particular criminal activity was performed in association with, or for the benefit of, a criminal street gang. He had prepared written and verbal expert opinions in over 20 gang cases. He had never offered an opinion that a crime was not gang-related.

**Yandell's testimony about the Fresno Bulldogs**

Yandell testified his primary focus was on the northern and southern gangs, which operated in Tulare County. However, he had some experiences with the Fresno Bulldogs throughout his career. The Bulldogs operated in the city and unincorporated areas of Fresno, but there were a few members who came through Tulare County. He came into contact with members of the Fresno Bulldogs when

9

he worked at the jail. He also reviewed police reports about the criminal activities of the Fresno Bulldogs in Tulare and Fresno Counties.

Prior to Yandell's work in this case, he had conducted investigations in two other cases involving the Fresno Bulldogs, and interviewed about 20 members of the gang. He had investigated a jail assault involving members of the Fresno Bulldogs, but he did not testify in that case because the defendant entered a plea. In February 2008, he investigated Felipe Rivera, an admitted member of the Fresno Bulldogs, who was arrested for possession of narcotics for sale in Goshen.

In preparation for the trial in this case, Yandell received two hours of in-person "block training" from two officers with the Fresno County Sheriff's Department MAGEC team, who were certified as experts on the Fresno Bulldogs and participated in preparing the civil injunction against that gang. He did not receive any training from former members of the Fresno Bulldogs to prepare for this case.

Yandell testified about the creation of the Fresno Bulldogs, which was the result of a dispute within the Nuestra Familia prison gang in the late 1960's and early 1970's. A war broke out within Nuestra Familia, which spilled out of the prisons and into the streets of Fresno. The breakaway group originally called themselves "the F14." In the late 1970's, the group successfully became a separate entity and changed its name to the Fresno Bulldogs. The Bulldog gang was slightly different from other gangs because it was not associated with either the northern or southern structure, it was not allied with any other gang, and it considered both the northern and southern gangs as enemies. The Bulldogs were also different because there was no official hierarchy of shot callers, but there were still informal leaders who gained respect within the subsets.

Yandell explained there were an estimated 5,300 active members of the Fresno Bulldogs in Fresno County, with an additional 10,000 associates. The Fresno Bulldogs had started moving out of Fresno County and into Tulare County because of the gang injunction. There were under 20 active members of the Fresno Bulldogs in Tulare County.

The Fresno Bulldogs claimed the color red, but they were not loyal to the Nortenos. The Bulldogs used the insignia from Fresno State University, and common signs and tattoos included dog paws and bulldog faces from Fresno State apparel.

Yandell explained the California Department of Corrections (CDC) classified the Fresno Bulldogs as a "disruptive group" for housing purposes, which was "one step shy of a prison gang."

Yandell testified there were over 40 subsets, cliques, and subcliques within the Fresno Bulldogs, based on specific geographic areas and turfs. These subsets included the McKenzie Street Dogs, Daisy Park Bulldogs, and the Primos. All these subsets claimed allegiance to the Fresno Bulldogs as their umbrella organization. Members of the various subsets associated with each other, on the street and in prison, and showed the same colors and symbols as the Fresno Bulldogs.

Yandell testified the primary activities of the Fresno Bulldogs were crimes such as murder, attempted murder, theft, robbery, kidnapping, and drug sales. Yandell testified about other offenses committed by members of the Fresno

Bulldogs, based on his review of law enforcement records and reports from allied agencies; he explained these documents are normally relied upon by gang experts. In February 2006, the Fresno County gang unit executed search warrants for the homes of Saul "Taz" Martinez and Rafael "Shadow" Perez, who were both members of the Fresno Bulldogs. The warrants were for weapons, narcotics, and gang paraphernalia. Martinez was later convicted of violating Health and Safety Code section 11359. Yandell testified the incident involved Fresno Bulldog activity because known gang members were armed and possessed narcotics.

"[Y]ou have known self-admitted gang members with guns, firearms, narcotics, paraphernalia for sales and gang indicia. [¶] You have drugs that are being sold, firearms that are being used to protect the gang members while committing crimes, as well as the clout that's perceived from them having these guns to commit assaults."
Yandell testified about another incident which fit the pattern of Fresno Bulldog activity.

In April 2006, Nelson Mendoza, a known and admitted member of the Fresno Bulldogs, pleaded guilty to burglary, based on an incident where Mendoza and two other known Bulldogs burglarized a vehicle. They had specific assignments to perform the job, split up after they committed the offense, and lied to the police to cover for each other.

Yandell testified that the robbery of the Chevron store also fit the pattern of Fresno Bulldog activity because it was committed by a team of people, most of the men were very serious gang members, they planned the robbery, they relied on each other to perform it, they used multiple weapons and cars, they had specific assignments during the robbery rather than acting "somewhat hodgepodge upon getting in through the door," they switched cars after the crime, they took numerous steps to avoid detection, and they divided the money. Yandell conceded that every robbery committed by a gang member was not necessarily committed for the gang's benefit.

**Yandell's testimony about defendant and the other robbery suspects**

As part of his preparation in this case, Yandell reviewed materials in two large binders which contained the arrest history for each suspect. This information included all arrests, probation reports, and contacts with law enforcement (from something as simple as a runaway juvenile to a gang field interview). He prepared a written report as to whether the offenses in this case were gang-related.

Yandell testified that defendant had numerous tattoos, including "bull" on the right hand and "dogs" on the left hand; "Primos" on his left wrist; "este lado" on his arm, which meant east side; and a bulldog face on his shoulder.

Yandell testified to his opinion that Francisco was an extremely active participant in the "Primos" clique of the Fresno Bulldogs—based on Francisco's prior contacts with law enforcement, his admissions on the street and in custody, and his associates. Francisco had several tattoos consistent with the Fresno Bulldogs, including a dog paw and a bulldog face.
Yandell also believed Johnson was a member of the Fresno Bulldogs, based on his gang tattoos, prior admissions while in custody, and prior contacts with law enforcement officers. Johnson previously admitted he was an active member of

the Fresno Bulldogs, and he had a large tattoo of "MSD" on the back of his head. The initials stood for the McKenzie Street Bulldogs, one of the subsets of the Fresno Bulldogs.

Yandell testified that Benjamin was a member of the Daisy Park Bulldogs, another subset which claimed allegiance to the Fresno Bulldogs—based on his prior custodial admissions, prior contacts, and tattoos.

Yandell considered Felecia to be an associate of the Fresno Bulldogs based on her familial relationships with Francisco and Johnson. Yandell did not have any prior gang contact information on Michael, but considered Michael as an associate of the Bulldogs based on his relationship with Felecia. It was also significant that Francisco assured Michael, before the robbery, that the gang would take care of him if he was taken into custody. Yandell explained that the gangs "throw a false security of we will protect you. We will protect your families. No harm will come your way once you join us."

Based on a hypothetical question, Yandell testified that a robbery committed by several members of the Fresno Bulldogs was done for the benefit of, at the direction of, or in association with the gang. Such a robbery, committed by several members of the gang working together, benefitted the gang because the large amount of money that was stolen would be used to further their criminal lifestyles and avoid working. It was extremely uncommon for $160,000 to be taken during a convenience store robbery. Yandell further explained that "whenever a gang member commits a robbery, the proceeds of that crime will afford them money or valuables to further their criminal ways," or escape arrest. It would be more notorious for Fresno Bulldogs to commit such a robbery in the northern territory of Porterville, where they have a very small presence. The crime would garner extensive media coverage, boost the gang's reputation, and show up the Tulare County gangs.

Yandell explained it was important for gang members to gain notoriety by "putting in work," whether through assaults, thefts, robberies or murders, to earn the respect of other gang members. In Yandell's opinion, the hypothetical robbery was gang-related because the robbery was committed in association with other known gang members. The presence of firearms during the robbery was also significant because it showed the witnesses and opposing gangs that they had access to the weapons, and they were not afraid to use them to commit violent assaults. "So it shows that they're arming themselves for their criminal lifestyle, and they're basically advertising this to other-to other gang members and to the public at large which will instill fear in the general public; therefore, promoting their gang."

"[The other gang members] not only go in to commit this crime, but they plan it out ... it's a strategic plan, including a switch of cars ..., equipment and tactical operations for who's gonna [ *sic* ] carry the pistol, specific jobs and ... assignments were planned out and given to each person. Otherwise, it just would have been a hodgepodge of five guys running in and who's doing what. [¶] This was planned out very specifically, and in gang world, in gang culture, gang members have to be able to trust their ... homies. They have to be able to trust each other for things of this nature because that's all they have is basically other gang members to rely on."

Yandell conceded the suspects in this case did not shout gang slogans, display gang signs, or show the color red during the robbery. However, the

suspects were wearing black clothing and "had orchestrated a uniform" for the crime.

## DEFENSE EVIDENCE

Defendant lived with his girlfriend and grandmother in Fresno. Lydia Loera, defendant's grandmother, and Irene Salinas, his girlfriend, testified that defendant was home the night of the robbery. Loera testified defendant left the house and went to the store for only 30 or 40 minutes, and returned with Salinas. [FN8] Loera testified that much later, Francisco and Johnson arrived at her house, went into defendant's bedroom with him, and left about 10 minutes later. Mercy Moreno also lived at Loera's house, and testified that defendant and Irene left the house for about 20 minutes, they returned, and he was there all night. Loera and Salinas knew the police later found $16,000 at the house, but testified the money did not belong to them.[FN9]

> FN8. In rebuttal, Officer Cox testified that he interviewed defendant's grandmother on the night that defendant was arrested, she could not remember whether she had seen defendant on the night of the robbery, and she never said defendant was with her the entire night.
>
> FN9. Michael testified that defendant's girlfriend was present when Francisco counted out and distributed the money at the house where defendant lived with his grandmother.

Testimony of defense gang expert

Albert Ochoa testified as the defense gang expert. He had worked with gang members in educational and counseling situations for 32 years. He had interacted with members of northern and southern gangs, and members of the Fresno Bulldogs. He had also conducted Internet research about the Fresno Bulldogs.

Ochoa believed the Chevron robbery was not gang-related because the perpetrators did not announce themselves as gang members, follow up with another crime in the same area, or commit the crime against a rival gang member. The crime was committed outside of Bulldog territory and the perpetrators tried to conceal their identities. However, Ochoa admitted that defendant, Francisco, Benjamin, and Johnson were all members of the different cliques of the Fresno Bulldogs. Defendant's brother was also a Fresno Bulldog.

**Defendant's testimony**

Defendant testified at trial and admitted that at the time of the robbery, he was a member of the Fresno Bulldogs, he was known as "Little Mix," and he had tattoos that said "Bulldogs," "este lado," and "Primos." Defendant testified the Fresno Bulldogs committed crimes, the members possessed weapons, and there were "way more" than three members in the gang. Defendant admitted he used to be "tight" with Francisco and they were both in the "Primos" clique of the Fresno Bulldogs. The McKenzie Street and Daisy Park Bulldogs were other cliques. Defendant used to hang out with Benjamin, and he knew Johnson. Defendant also knew Saul Martinez (the subject of Yandell's testimony about predicate offenses) and that Martinez had Fresno Bulldog tattoos.

Defendant denied that he committed the robbery of the Chevron store. Defendant testified he was at his grandmother's house on the night of the robbery,

and he only left to go to the store for 30 to 45 minutes. Around 11:30 p.m., Francisco and Johnson arrived at the house. Francisco offered to pay defendant $400 if he held $10,000 for them. Defendant agreed, and Francisco gave him another $2,000. Defendant testified that Michael and Felecia might have been with Francisco and Johnson at that time, but they did not come inside the house. Defendant accepted the money and put it in various places in his bedroom.

Defendant testified that when he was interviewed by the police, he was tired and scared and eventually told them just what they wanted to hear-that he was involved in the robbery. Defendant testified that he was no longer a member of the Fresno Bulldogs. Defendant also testified that things had changed with Francisco because of an incident after the robbery, when Francisco and Johnson came at him from behind because they were mad at him. Defendant admitted that he gave Francisco's name to the police.

(Ex. A at 3-21.)

## DISCUSSION

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008 (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.   Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court." Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000). Habeas relief is also available if the state court's decision "involved an unreasonable application" of clearly established federal law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. Richter, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412. Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent. Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 737 (2011). Under § 2254(d)(1), review is limited to the record that was before the state court adjudicated the claim on the merits. Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1398 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."

1  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254

2  apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v.

3  Blodgett, 393 F.3d 943, 976-77 (2004).

4        Courts further review the last reasoned state court opinion.  See Ylst v. Nunnemaker, 501

5  U.S. 979, 803 (1991).  However, "[w]here a state court's decision is unaccompanied by an

6  explanation, the habeas petitioner's burden still must be met by showing there was no reasonable

7  basis for the state court to deny relief."  Richter, 131 S.Ct. at 784.

8  III.    Insufficient Evidence to Support Gang Enhancement

9        Petitioner contends there was insufficient evidence to support the true finding and sentence

10  on the criminal street gang enhancement.  More specifically, he claims the gang expert lacked

11  foundation to testify and without such testimony there was insufficient evidence to support the

12  enhancement.

13        Petitioner raised the claim on direct appeal and the California Court of Appeal, Fifth

14  Appellate District denied the claim in the last reasoned decision, stating:

15        Defendant raises several issues as to whether the gang enhancement is
supported by substantial evidence. All of these contentions are based on his

16  underlying argument that Detective Yandell was not competent to testify as the
prosecution's expert on the Fresno Bulldogs, his testimony lacked foundation and
should have been excluded, and his testimony cannot provide the basis for finding

17  substantial evidence to support the jury's true finding on the gang enhancement.

18  
19        We will address defendant's substantial evidence contentions in issue III,
*post.* In this section, we will address defendant's underlying issue as to whether the
court abused its discretion when it permitted Yandell to testify as the prosecution's

20  gang expert.

21  A. *The gang enhancement*

22        We begin with the statutory basis for the gang enhancement. Section
186.22, subdivision (b)(1) provides for the imposition of an enhancement for "any

23  person who is convicted of a felony committed for the benefit of, at the direction
of, or in association with any criminal street gang, with the specific intent to

24  promote, further, or assist in any criminal conduct by gang members...."
To establish that a group is a criminal street gang within the meaning of section
186.22, subdivision (b)(1), the People must prove: (1) the group is an ongoing

25  association of three or more persons sharing a common name, identifying sign, or
symbol; (2) one of the group's primary activities is the commission of one or more

26  statutorily enumerated criminal offenses; and (3) the group's members must engage
in, or have engaged in, a pattern of criminal gang activity, by committing,

27  attempting to commit, or soliciting two or more of the enumerated offenses, the so-
called "predicate offenses." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617, 59

28  

16

Cal.Rptr.2d 356, 927 P.2d 713 (*Gardeley* ); *People v. Duran* (2002) 97 Cal.App.4th 1448, 1457, 119 Cal.Rptr.2d 272 (*Duran* ); § 186.22, subd. (f).)

The prosecution may rely on expert testimony to prove the required elements to support a gang enhancement. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048, 16 Cal.Rptr.3d 880, 94 P.3d 1080 (*Hernandez* ).) The substantial evidence standard of review applies to determine whether the jury's true findings on gang allegations are supported by the evidence. (*Duran, supra,* 97 Cal.App.4th at pp. 1456–1457, 119 Cal.Rptr.2d 272.)

B. *Expert opinion testimony about gangs*

"It is well settled that a trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation. [Citation.]" (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196, 46 Cal.Rptr.3d 839 (*Frank S.*).) The subject matter of the culture and habits of street gangs meets the criteria for the admissibility of expert opinion because such evidence is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (*Gardeley, supra,* 14 Cal.4th at p. 617, 59 Cal.Rptr.2d 356, 927 P.2d 713; *Frank S., supra,* 141 Cal.App.4th at pp. 1196–1197, 46 Cal.Rptr.3d 839.)

The expert testimony may address "the size, composition or existence of a gang [citations], gang turf or territory [citations], an individual defendant's membership in, or association with, a gang [citations], the primary activities of a specific gang [citations], motivation for a particular crime, generally retaliation or intimidation [citations], whether and how a crime was committed to benefit or promote a gang [citations], rivalries between gangs [citation], gang-related tattoos, gang graffiti and hand signs [citations], and gang colors or attire [citations]." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 657, 126 Cal.Rptr.2d 876, fns. omitted (*Killebrew* ).)

The expert may testify regarding certain activities of the gang, even though they may parallel the elements of the criminal street gang allegation. The expert may also testify about whether the defendant acted for the benefit of, at the direction of, or in association with a gang, even though it is an ultimate factual issue for the jury to decide, because these are matters far beyond the common experience of the jury. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 508–509, 68 Cal.Rptr.2d 135.)

C. *Admissibility of expert testimony*

The trial court has wide discretion to admit or exclude expert testimony. (*People v.Roberts* (1992) 2 Cal.4th 271, 298, 6 Cal.Rptr.2d 276, 826 P.2d 274.) " '[A] person is qualified to testify as an expert if he has special knowledge, skill, experience, training or education sufficient to qualify him as an expert on the subject to which his testimony relates. Whether a person qualifies as an expert in a particular case, however, depends upon the facts of the case and the witness's qualifications. [Citation.] The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion in [ *sic* ] shown. [Citations.]' [Citation.] This court may find error only if the witness ' *clearly lacks* qualification as an expert.' [Citation.]" (*People v. Singh* (1995) 37 Cal.App.4th 1343, 1377, 44 Cal.Rptr.2d 644, italics in original.)

Evidence Code section 802 provides, in pertinent part, that "[a] witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter ... upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." Expert testimony may be "premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions" and is reliable. (*Gardeley, supra,* 14 Cal.4th at p. 618, 59 Cal.Rptr.2d 356, 927 P.2d 713.) If the threshold requirement of reliability is met, "even matter that is ordinarily inadmissible can form the proper basis for an expert's opinion testimony." (*Ibid.,* italics omitted; see also *Duran, supra,* 97 Cal.App.4th at p. 1463, 119 Cal.Rptr.2d 272.) Since Evidence Code section 802 permits an expert witness to " 'state on direct examination the reasons for his opinion and the matter ... upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Gardeley, supra,* 14 Cal.4th at p. 618, 59 Cal.Rptr.2d 356, 927 P.2d 713.)

As applied to the gang enhancement, there is no requirement for an officer to possess an academic or professional credential to qualify as a gang expert, and the foundation for an officer's opinion may be based on the officer's experience with "street gangs in general." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370, 37 Cal.Rptr.2d 596 (*Olguin*).) Law enforcement officers have been found qualified to provide expert testimony regarding gangs simply based on their investigative experience. (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 196, 66 Cal.Rptr.2d 123, 940 P.2d 710; *People v. Ochoa* (2001) 26 Cal.4th 398, 438, 110 Cal.Rptr.2d 324, 28 P.3d 78, abrogated on other grounds as stated in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14, 133 Cal.Rptr.2d 18, 66 P.3d 1123; *People v. Gonzalez* (2006) 38 Cal.4th 932, 949, fn. 4, 44 Cal.Rptr.3d 237, 135 P.3d 649.)

Also as applied to the gang enhancement, "[e]xpert testimony may be founded on material that is not admitted into evidence and on evidence that is ordinarily inadmissible, such as hearsay, as long as the material is reliable and of a type reasonably relied upon by experts in the particular field in forming opinions. [Citation.] Thus, a gang expert may rely upon conversations with gang members, his or her personal investigations of gang-related crimes, and information obtained from colleagues and other law enforcement agencies. [Citations.]" (*Duran, supra,* 97 Cal.App.4th at pp. 1463–1464, 119 Cal.Rptr.2d 272.) An officer testifying as a gang expert, just like any other expert, may give testimony that is based on hearsay, including conversations with gang members as well as with the defendant. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9, 19 Cal.Rptr.3d 402.)

"'There is no hard and fast rule that the expert cannot be asked a question that coincides with the ultimate issue in the case.' [Citations.]" (*People v. Valdez, supra,* 58 Cal.App.4th 494, 507, 68 Cal.Rptr.2d 135.) However, a gang expert may not testify whether an individual possessed certain knowledge or a specific intent during the commission of an offense. (*Frank S., supra,* 141 Cal.App.4th at p. 1197, 46 Cal.Rptr.3d 839; *Killebrew, supra,* 103 Cal.App.4th at p. 658, 126 Cal.Rptr.2d 876; *People v. Ramon* (2009) 175 Cal.App.4th 843, 850–853, 96 Cal.Rptr.3d 459.)

D. *Analysis*

Defendant argues the jury's true findings on the gang enhancements are not supported by substantial evidence and cannot be based on Detective Yandell's testimony because his testimony was conclusory and unsupported by any reliable

18

or sufficient foundational basis. (AOB 14–17, 28–34) Defendant asserts that Yandell's experience was limited to the northern and southern gangs of Tulare County, all of Yandell's information about the Fresno Bulldogs was based on a "two-hour 'crash course' " provided by other law enforcement officers about that gang, and he lacked any personal knowledge or experience in dealing with the Fresno Bulldogs.

We disagree with defendant's contentions. The court properly allowed Yandell to testify as an expert and did not abuse its discretion on this point. As set forth *ante,* Yandell extensively testified about the foundation and basis for his expert opinions about gangs in general, and the Fresno Bulldogs in particular. Contrary to defendant's arguments, Yandell's knowledge of the Fresno Bulldogs was not simply based on a "two hour 'crash course.' " Yandell explained his primary focus was on the northern and southern gangs which operated in Tulare County, and that he had received additional training about the Fresno Bulldogs from members of the Fresno County Sheriff's Department's MAGEC Team. However, Yandell also explained that he had interacted with members of the Fresno Bulldogs throughout his career, primarily when he worked at the jail, and he had interviewed members of that gang and conducted investigations into two other cases involving the Fresno Bulldogs. He also explained that members of the Fresno Bulldogs had started moving out of Fresno, and into Tulare County, because of Fresno County's gang injunction. Yandell conceded there were only about 20 members of the Fresno Bulldogs in Tulare County, but explained why the Bulldogs would have committed a crime in Tulare County: it was more notorious for the Fresno Bulldogs to commit a robbery in Porterville, in the midst of northern and southern turf, where they have a very small presence.

Defendant complains that Yandell's knowledge about the Fresno Bulldogs was based on his review of police reports and conversations with other law enforcement officers. As the court in *Duran* explained, however, "[e]xpert testimony may be founded on material that is not admitted into evidence and on evidence that is ordinarily inadmissible, such as hearsay, as long as the material is reliable and of a type reasonably relied upon by experts in the particular field in forming opinions. [Citation.] Thus, a gang expert may rely upon conversations with gang members, his or her personal investigations of gang-related crimes, and information obtained from colleagues and other law enforcement agencies. [Citations.]" (*Duran, supra,* 97 Cal.App.4th at pp. 1463–1464, 119 Cal.Rptr.2d 272.)

For example, in *Gardeley, supra,* 14 Cal.4th 605, 59 Cal.Rptr.2d 356, 927 P.2d 713, the court held an officer properly testified as an expert about the nature and activities of the Family Crip gang, based on the officer's opinions which were formed from "conversations with the defendants and with other Family Crip members, [the officer's] personal investigations of hundreds of crimes committed by gang members, as well as information from his colleagues and various law enforcement agencies ." (*Gardeley, supra,* 14 Cal.4th at p. 620, 59 Cal.Rptr.2d 356, 927 P.2d 713.)

In *People v. Gamez* (1991) 235 Cal.App.3d 957, 286 Cal.Rptr. 894 (*Gamez*) (disapproved on another ground in *Gardeley, supra,* 14 Cal.4th at p. 624, fn. 10, 59 Cal.Rptr.2d 356, 927 P.2d 713), the court rejected the defendant's argument that a gang expert's testimony was based on unreliable hearsay from unidentified sources. *Gamez* found an officer was properly permitted to testify as an expert because his opinions were based on "personal observations and experience, the observations of other officers in the department, police reports, and

conversations with other gang members," together with photographs of the defendant throwing gang signs, his prior contacts with the police while in the presence of other gang members, his prior admissions of being a member of the gang, and his gang graffiti on textbooks. (*Gamez, supra,* 235 Cal.App.3d at p. 967, 286 Cal.Rptr. 894.)

As explained in *Gamez, Gardeley,* and *Duran,* the trial court in this case properly overruled defendant's numerous foundational objections to Yandell's testimony. Yandell properly relied upon his review of police reports, conversations with fellow officers, and his own personal experiences in testifying about his opinion regarding the activities of the Fresno Bulldogs.

## III. SUBSTANTIAL EVIDENCE TO SUPPORT THE GANG ENHANCEMENT

Defendant contends there is insufficient evidence as a matter of law to support the jury's findings that he committed the substantive offenses for the benefit of, in association with, or at the direction of a criminal street gang (§ 186.22, subd. (b)). As to the particular elements of the gang enhancement, defendant argues there is no competent evidence to prove defendant and his accomplices were members of the Fresno Bulldogs, or to prove the primary activities and pattern of criminal activity elements.

As we have explained, the substantial evidence standard of review applies to review the jury's true findings on the section 186.22, subdivision (b) gang enhancement. (*Duran, supra,* 97 Cal.App.4th at pp. 1456–1457, 119 Cal.Rptr.2d 272.) We will examine each of defendant's substantial evidence arguments.

A. Evidence of the robbery participants' membership in the gang

Defendant argues there is no competent evidence that defendant or any of the other robbers were members of the Fresno Bulldogs. Active participation in the context of a criminal street gang is defined as "involvement with a criminal street gang that is more than nominal or passive." (*People v. Castenada* (2000) 23 Cal.4th 743, 747, 97 Cal.Rptr.2d 906, 3 P.3d 278.) Evidence of gang activity and culture need not necessarily be specific to a particular local street gang, as opposed to a larger organization. (See, e.g., *People v. Ortega* (2006) 145 Cal.App.4th 1344, 1355–1357, 52 Cal.Rptr.3d 535; *In re Jose P.* (2003) 106 Cal.App.4th 458, 467–468, 130 Cal.Rptr.2d 810.) An individual's membership in a criminal street gang is a proper subject for expert testimony. (*Duran, supra,* 97 Cal.App.4th at p. 1464, 119 Cal.Rptr.2d 272.)

At the close of the prosecution's case, defendant moved for dismissal of the gang enhancement pursuant to section 1118.1. To the extent defendant challenges the court's denial of his motion for dismissal as to the gang enhancement, we find the prosecution presented overwhelming evidence that defendant and his accomplices were members of the Fresno Bulldogs when they committed the offenses in this case. As to the accomplices, Detective Yandell extensively described the reasons for his opinion why Benjamin, Francisco, and Johnson were members of the Fresno Bulldogs, primarily based on their distinctive tattoos and prior admissions of membership in either the Bulldogs or that gang's subsets and cliques. Yandell explained all cliques within the Fresno Bulldogs were loyal to the larger gang, and all clique members got along with each other. Yandell further explained that Felecia was considered an associate of the Fresno Bulldogs, based on her family relationships with her brother, Francisco, and her cousin, Johnson. He also explained that Michael was considered an associate, based on his

20

relationship with Felecia, and Francisco's promise that the gang would take care of Michael if he was taken into custody for the robbery.

As for defendant, he correctly points out that Yandell did not offer an opinion as to whether he was a member of the Fresno Bulldogs. However, there is overwhelming evidence to support that fact. During his postarrest interview, which was introduced during the prosecution's case-in-chief, defendant admitted he was a "bulldog," that he was at the store during the robbery, and that he hit the clerk with the baseball bat. Yandell explained that defendant's tattoos included "bull" on the right hand and "dogs" on the left hand, and "Primos" on his left wrist. Yandell testified that Francisco was also a member of the Primos clique. Michael testified that he knew defendant and Francisco were good friends, and defendant said they called themselves the "Primos."

To the extent that defendant generally challenges the sufficiency of the evidence to support the jury's finding on the gang enhancement, we further note that defendant testified at trial and denied any involvement in the robbery, but again admitted he was a member of the Fresno Bulldogs at the time of the robbery, he used to be "tight" with Francisco, and they were both in the "Primos" clique.

There is overwhelming evidence that defendant and his accomplices were members of the Fresno Bulldogs and/or that gang's cliques when they committed the substantive offenses in this case.

B. *The primary activities element*

Defendant asserts there is no competent evidence to prove the primary activities element of the gang enhancement because Detective Yandell simply stated his opinion about the gang's primary activities without providing any foundation for that opinion.

"To trigger the gang statute's sentence-enhancement provision [citation], the trier of fact must find that one of the alleged criminal street gang's primary activities is the commission of one or more of certain crimes listed in the gang statute." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322, 109 Cal.Rptr.2d 851, 27 P.3d 739 (*Sengpadychith*).) "Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities. Both past and present offenses have some tendency in reason to show the group's primary activity [citation] and therefore fall within the general rule of admissibility [citation]." (*Id.* at p. 323, 109 Cal.Rptr.2d 851, 27 P.3d 739.)

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations," as opposed to the "occasional commission of those crimes by [one or more of] the group's members." (*Sengpadychith, supra,* 26 Cal.4th at p. 323, 109 Cal.Rptr.2d 851, 27 P.3d 739.)

"Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute," and may be accomplished through expert testimony. (*Id.* at p. 324, 109 Cal.Rptr.2d 851, 27 P.3d 739, italics in original.) The enumerated criminal acts which consist of the "primary activities" include unlawful homicide, manslaughter, assault with a deadly weapon or by means of force likely to produce great bodily injury, burglary, robbery, narcotics offenses,

shooting at an inhabited dwelling or motor vehicle, discharging a firearm from a motor vehicle, felony vandalism, and grand theft. (§ 186.22, subd. (e).)

Proof of the primary activities element may be accomplished through expert testimony. (*Sengpadychith, supra,* 26 Cal.4th at p. 324, 109 Cal.Rptr.2d 851, 27 P.3d 739; *Gardeley, supra,* 14 Cal.4th at p. 617, 59 Cal.Rptr.2d 356, 927 P.2d 713.) "The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and *information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities.* [Citations.]" (*Duran, supra,* 97 Cal.App.4th at p. 1465, 119 Cal.Rptr.2d 272, italics added.)

Again, to the extent that defendant challenges the court's denial of his motion to dismiss the gang enhancement, we find there was substantial evidence to support the court's ruling based on Detective Yandell's testimony. As we have explained, the court did not abuse its discretion when it permitted Yandell to testify as an expert regarding the Fresno Bulldogs, and there was a sufficient foundation for his opinions about that gang and its activities. Yandell testified about the large number of members and associates in the Fresno Bulldogs, and the primary activities of the Fresno Bulldogs were crimes such as murder, attempted murder, theft, robbery, kidnapping, and drug sales.

To the extent that defendant generally challenges the sufficiency of the evidence to support the jury's finding on the primary activities element of the gang enhancement, defendant testified at trial that he used to be a member of the Fresno Bulldogs, he knew members of the Fresno Bulldogs, there were "way more" than three members, and that the gang's members committed crimes and possessed weapons.

Defendant argues Yandell's testimony about the gang's primary activities lacked a sufficient foundational basis and was conclusory, based on the holding in *In re Alexander L.* (2007) 149 Cal.App.4th 605, 57 Cal.Rptr.3d 226 (*Alexander L.*).) In that case, the court held the gang expert's testimony lacked foundation and was insufficient to support the primary activities element. The officer testified only about general offenses committed by the gang, and about a predicate offense in which the alleged gang member was actually acquitted of the gang allegation. (*Id.* at pp. 611–612, 57 Cal.Rptr.3d 226.) The officer failed to explain how he knew about the offenses. (*Id.* at p. 612, 57 Cal.Rptr.3d 226.) On cross-examination, the officer conceded that the vast majority of cases relating to the gang involved graffiti, and he failed to specify whether the incidents involved misdemeanor or felony vandalism. (*Ibid.*) *Alexander L.* held that since "information establishing reliability was never elicited from [the expert] at trial," it was "impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (*Ibid.,* fn. omitted.)

As explained in *People v. Martinez* (2008) 158 Cal.App.4th 1324, 70 Cal.Rptr.3d 680 (*Martinez* ), the gang expert in *Alexander L.* "never specifically testified about the primary activities of the gang. He merely stated 'he "kn[e]w" that the gang had been involved in certain crimes.... He did not directly testify that criminal activities constituted [the gang's] primary activities.' [Citation.]" (*Martinez, supra,* 158 Cal.App.4th at p. 1330, 70 Cal.Rptr.3d 680.) The court in *Martinez* contrasted the gang expert's testimony in that case with the insufficient foundational testimony in *Alexander L.:* "[In *Martinez* ], on the other hand, [the

22

gang expert] had both training and experience as a gang expert. He specifically testified as to [the gang's] primary activity. His eight years dealing with the gang, including investigations and personal conversations with members, and reviews of reports suffices to establish the foundation for his testimony. [Citation.]" (*Martinez, supra,* 158 Cal.App.4th at p. 1330, 70 Cal.Rptr.3d 680; see also *People v. Margarejo* (2008) 162 Cal.App.4th 102, 107–108, 75 Cal.Rptr.3d 465 [distinguishing *Alexander L.*].)

As we have explained, a gang expert's opinion may be based upon the expert's personal investigation of past crimes by gang members, and information about gangs learned from the expert's colleagues or other law enforcement agencies. ( *Vy, supra,* 122 Cal.App.4th at p. 1223, fn. 9, 19 Cal.Rptr.3d 402.) In this case, Detective Yandell's testimony provided substantial evidence about the primary activities of the Fresno Bulldogs. Yandell established the foundation for his testimony, he did not equivocate about the basis for his opinions, and he did not contradict himself about his opinions on the activities of the Fresno Bulldogs. In contrast, the expert in *Alexander L.* failed to establish the foundation for his testimony, failed to testify the crimes he cited constituted the gang's primary activities, equivocated on direct examination, and contradicted himself on cross-examination. Yandell's testimony did not suffer from these foundational defects. (Cf. *Alexander L., supra,* 149 Cal.App.4th at pp. 611–612, 57 Cal.Rptr.3d 226.) While Yandell's primary investigative focus was the northern and southern gangs in Tulare County, he had a sufficient foundation for his opinions about the Fresno Bulldogs, based on his own interactions with gang members when he worked at the jail, the gang's activities in Tulare County, his conversations with other law enforcement officers, and his review of law enforcement reports about the Fresno Bulldogs.

C. *The pattern of criminal activity element*

Defendant further asserts there is no competent evidence to prove the Fresno Bulldogs engaged in a pattern of criminal activity. Defendant argues that Detective Yandell improperly relied on hearsay documents about crimes committed by other members of the Fresno Bulldogs when he testified about the predicate offenses.

"A 'pattern of criminal gang activity' is defined as gang members' individual or collective 'commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' enumerated 'predicate offenses' during a statutorily defined time period. [Citation.] The predicate offenses must have been committed on separate occasions, or by two or more persons. [Citations.] The charged crime may serve as a predicate offense [citations], as can 'evidence of the offense with which the defendant is charged and proof of another offense committed on the same occasion by a fellow gang member.' [Citation.]" (*Duran, supra,* 97 Cal.App.4th at pp. 1457–1458, 119 Cal.Rptr.2d 272.) The crimes necessary to establish a pattern need not be gang-related. However, if the prosecution relies upon the current offense as one of the predicate offenses, that offense must be gang-related. (*Gardeley, supra,* 14 Cal.4th at pp. 621–622, 625, fn. 12, 59 Cal.Rptr.2d 356, 927 P.2d 713.) A certified minute order and other qualifying court records are admissible under the hearsay exception of the official records of conviction to prove not only the fact of conviction, but also that the offense reflected in the record occurred. (*Duran, supra,* 97 Cal.App.4th at pp. 1462–1463, 119 Cal.Rptr.2d 272.)

There is substantial evidence to support the pattern elements and the so-called "predicate offenses." The robbery of the Chevron store in this case,

committed by several members of the Fresno Bulldogs acting together, clearly qualifies as one of the predicate offenses. In addition, Yandell testified that in April 2006, Nelson Mendoza, a known and admitted member of the Fresno Bulldogs, pleaded guilty to burglary. Mendoza and two other known gang members burglarized a vehicle, they had specific assignments to perform the job, they split up after they committed the offense, and they lied to the police to cover for each other. The prosecution introduced the certified court records of Mendoza's conviction.

Defendant relies on two cases in support of his argument that Detective Yandell's testimony lacked sufficient foundation on the pattern element: *In re Leland D.* (1990) 223 Cal.App.3d 251, 272 Cal.Rptr. 709 (*Leland D.*) and *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 279 Cal.Rptr. 236 (*Nathaniel C.*). The facts of these cases are inapposite to the expert's testimony in this case.

In *Leland D.,* the gang expert initially testified that members of the defendant's gang engaged in the sale of rock cocaine and committed vehicle thefts and assaults. On further examination, he admitted he had no specific knowledge of who in the gang committed such offenses and "when, where and under what circumstances" they occurred. (*Leland D., supra,* 223 Cal.App.3d at p. 259, 272 Cal.Rptr. 709.) In addition, "[t]he sources of [his] conclusional pronouncements appear[ed] to have been hearsay statements from unidentified gang members and information pertaining to arrests of purported gang members all made without a definite timeframe being established." (*Ibid.*) *Leland D.* stressed that "[e]vidence that an individual has been arrested for an offense, without more, is not sufficient to establish either that a crime has been committed or that any particular individual is guilty of its commission," and concluded the expert's testimony "f[ell] far short of what is required to prove" the predicate offenses. (*Leland D.,* at pp. 258, 259, 272 Cal.Rptr. 709.)

*Nathaniel C.,* also found the expert's testimony about a predicate offense was insufficient. The expert witness was a South San Francisco police officer, and he learned about the offense from San Bruno police officers. The incident involved the shooting of a person the San Bruno police believed to be a member of the gang. The expert said the San Bruno police believed the shooter also was a gang member and the shooting was gang-related. (*Nathaniel C., supra,* 228 Cal.App.3d at p. 998, 279 Cal.Rptr. 236.) The court concluded the expert "offered only nonspecific hearsay of a *suspected* shooting of one [gang] member by another. The [expert] witness ... had no personal knowledge of the incident and only repeated what San Bruno police told him they believed about the shooting. Such vague, secondhand testimony cannot constitute substantial evidence that the required predicate offense by a gang member occurred." (*Id.* at p. 1003, 279 Cal.Rptr. 236, italics added.)

Detective Yandell's testimony about the predicate offenses was not based on the same type of conclusory, nonspecific hearsay and arrest information deemed insufficient in *Leland D.* and *Nathaniel C.* He was extensively aware of the facts and circumstances of the instant robbery. In addition, he testified in detail about the Nelson Mendoza case, certified court records were introduced to support his testimony, and he properly relied upon information from other law enforcement officers in explaining the gang-related nature of that offense. Yandell's testimony was far more specific than general hearsay evidence that gang members were suspected of committing the offenses. Moreover, as the jury was properly instructed, one of defendant's present offenses could also be used as evidence of a predicate offense in deciding whether one of the group's primary activities was commission of that crime, and whether a pattern of criminal gang activity had been

proved. The evidence clearly sufficed to establish a pattern of criminal gang activity.

D. *Substantial evidence*

We now turn to defendant's overall contention that there is insufficient evidence the robbery was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members ...." (§ 186.22, subd. (b)(1).) "As to the second prong of the enhancement, all that is required is a specific intent 'to promote, further, or assist in any criminal conduct by gang members.' [Citation.] Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. [Citation.]" (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322, 51 Cal.Rptr.3d 678.)

"A gang expert's testimony alone is insufficient to find an offense gang related. [Citation.] '[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang.' [Citation.]" (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657, 102 Cal.Rptr.3d 108 .)

A series of cases have found substantial evidence to support gang enhancements in cases where gang members commit offenses with fellow gang members, since such conduct satisfies the statutory requirement that the offenses must be committed "for the benefit of, at the direction of, *or in association with* any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1), italics added.) For example, in *People v. Morales* (2003) 112 Cal.App.4th 1176, 5 Cal.Rptr.3d 615 (*Morales* ), the defendant and two fellow gang members committed a robbery and other offenses, and the jury found the gang allegations true. The prosecution's gang expert testified that, based on a hypothetical, the crimes were committed in association with a criminal street gang because "they involved three gang members acting in association with each other. The gang provided 'a ready-made manpower pool....' That is, one gang member would choose to commit a crime in association with other gang members because he could count on their loyalty. They would 'watch his back....' In addition, the very presence of multiple gang members would be intimidating. The crime would benefit the individual gang members with notoriety among the gang, and the gang with notoriety among rival gang members and the general public." (*Id.* at p. 1197, 5 Cal.Rptr.3d 615.)

*Morales* rejected the defendant's argument that there was insufficient evidence that he committed the offenses to *benefit* his gang, and instead noted the gang expert's focus was on "a crime committed, not just by a gang member, but by several gang members, acting in association with each other. Also, [the expert] did not testify that such a crime necessarily would benefit the gang, merely that it would be committed *either* for the benefit of, *or* at the direction of, *or* in association with the gang." (*Morales, supra,* 112 Cal.App.4th at p. 1197, 5 Cal.Rptr.3d 615.)

"Defendant argues that reliance on evidence that one gang member committed a crime in association with other gang members is 'circular....' Not so. Arguably, such evidence alone would be insufficient, even when supported by

expert opinion, to show that a crime was committed for the *benefit* of a gang. The crucial element, however, requires that the crime be committed (1) for the benefit of, (2) at the direction of, *or* (3) in *association* with a gang. Thus, the typical close case is one in which one gang member, acting alone, commits a crime. Admittedly, it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang. Here, however, there was no evidence of this. Thus, the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members.

"If defendant is arguing that there was insufficient evidence of the specific intent element (as opposed to the benefit/direction/association element), we disagree. Again, specific intent to *benefit* the gang is not required. What is required is the 'specific intent to promote, further, or assist in any criminal conduct by gang members....' Here, there was evidence that defendant intended to commit robberies, that he intended to commit them in association with [his fellow gang members], and that he knew that [they] were members of his gang. Moreover, ... there was sufficient evidence that defendant intended to aid and abet the robberies [his fellow gang members] actually committed. It was fairly inferable that he intended to assist criminal conduct by his fellow gang members." (*Morales, supra,* 112 Cal.App.4th at p. 1198, 5 Cal.Rptr.3d 615.)

In *People v. Romero* (2006) 140 Cal.App.4th 15, 43 Cal.Rptr.3d 862, the defendant drove fellow gang members to the site of a drive-by shooting, and the court found the gang enhancements were supported by substantial evidence because the defendant committed the offenses in association with fellow gang members. "There was ample evidence that [defendant] intended to commit a crime, that he intended to help [his accomplice] commit a crime, and that he knew [his accomplice] was a member of his gang. This evidence creates a reasonable inference that [defendant] possessed the specific intent to further [his accomplice's] criminal conduct." (*Id.* at p. 20, 43 Cal.Rptr.3d 862.)

A similar result was reached in *People v. Martinez, supra,* 158 Cal.App.4th 1324, 70 Cal.Rptr.3d 680, where the defendant admitted membership in a criminal street gang and committed robberies with another admitted member of that gang. The defendant argued there was insufficient evidence to support the gang enhancement because his accomplice was also his brother-in-law, and they committed the offenses for their own personal benefit. (*Id.* at pp. 1332–1333, 70 Cal.Rptr.3d 680.) *Martinez* rejected the argument and noted the gang expert testified "this evidence showed defendant committed the robbery *in association* with the gang. The elements of the gang enhancement may be proven by expert testimony. [Citation.] Nor does it matter that defendant did not commit the crime on or live in gang turf or that [the gang expert] had never heard of defendant or [his accomplice]. Defendant did not even need to be an '"active"' or '"current, active"' gang member. [Citation.]" (*Id.* at p. 1332, 70 Cal.Rptr.3d 680, italics added.) "Here defendant, an admitted gang member sporting gang tattoos, actually committed the robbery with a gang confederate. That he was not in his gang's territory, by itself, does not necessarily overcome the other supporting evidence." (*Id.* at p. 1333, 70 Cal.Rptr.3d 680.)

In *People v. Leon* (2008) 161 Cal.App.4th 149, 73 Cal.Rptr.3d 786 (*Leon* ), the defendant and an accomplice were members of the same gang, and they stole a car and threatened an eyewitness. The defendant argued there was insufficient evidence that he committed the offenses for the benefit of his gang. *Leon* relied on *Morales* and *Romero* and rejected this argument because "a 'specific intent to

*benefit* the gang is not required.' [Citation.]" (*Id.* at p. 163, 73 Cal.Rptr.3d 786.) *Leon* held there was substantial evidence that the defendant committed the offenses in association with a fellow gang member. There was also evidence of the defendant's specific intent because he intended to commit the offenses, he intended to do so in association with his accomplice, and he knew his accomplice was a member of his gang. (*Ibid.*)

As explained in *Morales, Martinez,* and *Leon,* there is substantial evidence to support the gang enhancements in this case because defendant, an admitted member of the Primos clique of the Fresno Bulldogs, committed the offenses "in association with" Francisco, Benjamin, and Johnson, who were also members of known cliques within the Fresno Bulldogs. Although Michael provided the information about the location of the cash, defendant and his fellow Bulldogs handled the planning and execution of the crime. Defendant knew his associates were members of the Fresno Bulldogs, he intended to commit the robbery in association with them, he shared the robbery proceeds with them, and the cash potentially provided defendant and his fellow Fresno Bulldogs with living expenses. We conclude that the jury's true findings on the gang enhancements in this case are supported by substantial evidence.[FN11]

FN11. Given our finding that the gang enhancement is supported by substantial evidence, we need not address defendant's contention that the related firearm enhancement could not be imposed under section 12022.53, subdivision (e). However, in section V, *post,* we will address defendant's alternative argument that the court improperly imposed terms for both section 186.22, subdivision (b) and section 12022.53, subdivision (e).

(Resp's Ans., Ex. A at 25-43.)

The law on insufficiency of the evidence claim is clearly established.  The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.  In cases where the evidence is unclear or would support conflicting inferences, "the federal court 'must presume - - even if it does not affirmatively appear in the record - - that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution.'" Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992) (quoting Jackson, 443 U.S. at 326); Coleman v. Johnson, 123 S.Ct. 2060, 2065 (2012) (per curiam) (once the jury is "convicted" as to the defendant's guilt, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality.")

1    As noted by the California Court of Appeal, Petitioner's claim is based on his assertion

2    that there was insufficient evidence because the testimony by the prosecution's gang expert,

3    Officer Yandell, should not have been credited because it lacked sufficient foundational basis and

4    was conclusory.  During trial, Officer Yandell testified as the prosecution's gang expert, including

5    being an expert in the Bulldogs criminal street gang.  Defense counsel objected to the testimony

6    on the ground that there was not a sufficient foundation with regard to his testimony on the

7    Bulldogs.  (RT 530.)  The trial court overruled the objection.  (Id.)

8    To the extent Petitioner attempts to argue that the trial court erroneously admitted Officer

9    Yandell's testimony, federal habeas corpus review is barred because this Court may not interfere

10   with a state evidentiary ruling unless it determines the ruling violated fundamental due process

11   and the right to a fair trial.  Fuller v. Roe, 182 F.3d 699, 703 (9th Cir. 1999).

12   Under California law, "[a] person is qualified to testify as an expert if he has special

13   knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the

14   subject to which his testimony relates."  (Ca. Evid. Code § 720, subd. (a).)  The trial court has

15   discretion to determine if a witness is competent and qualified to present expert opinion on an

16   issue.  Huffman v. Lindquist, 37 Cal.2d 465, 476 (1951).  "[T]here is no requirement for an

17   officer to possess an academic or professional credential to qualify as a gang expert, and the

18   foundation for an officer's opinion may be based on the officer's experience with "street gangs in

19   general."  (People v. Olquin, 31 Cal.App.4th 1355, 1370 (1994).)

20   The California Court of Appeal's decision denying Petitioner's claim was not an

21   unreasonable application of clearly established federal law.  A review of the record in this case

22   reveals that Officer Yandell's opinions were based on his experience as a sworn peace officer for

23   nine years and as a detective with the sheriff's gang unit for two years.  (RT 511-512.)  Yandell

24   was assigned the task of investigating the gang portion of criminal cases, participated in proactive

25   patrol in areas with high gang violence, contacted and identified gang members, and monitored

26   gang trends in Tulare County and surrounding counties.  (RT 512-513.)  He was a member of the

27   Tulare County's multiagency gang enforcement team, the California Gang Investigators

28   Association and the Tulare County Gang Task Force-in which he and other experts share

1  information and keep up to date on information about gang members in the area.  (RT 514-515.)

2  Yandell had participated in gang-related investigations pertaining to murder, attempted murder,

3  felony assault, vandalism, drug sales, and jail assaults, and conducted 25 search warrants for gang-

4  related evidence.  (RT 513, 515-516.)  He has qualified previously as a gang expert ten times in

5  the Tulare County Superior Court and authored at least 12 opinions in the last two years to

6  determine whether the criminal activity benefitted or was done in association with a criminal

7  street gang.  (RT 519-520.)  Yandell also worked at the main jail for 4 years where he classified

8  and interacted with gang members in a custodial setting.  (RT 522-524.)

9        Yandall had experience with the Fresno Bulldogs throughout his career and participated in

10  a two hour classroom session specific to the Fresno Bulldog gang.  (RT 520-521; 524-525.)

11  Yandall explained that Fresno Bulldogs' main territory is in the City of Fresno and the outlying

12  counties.  (RT 531.)  At the time of trial, Yandell indicated that Tulare County was beginning to

13  see a small influx of Bulldog members into the Orange Cove area because of several injunctions

14  filed against the gang in Fresno County.  (RT 531-532.)  He estimated there were approximately

15  15,000 Bulldog gang members and over 40 subsets.  (RT 533.)  Yandall received information

16  regarding the gang from Fresno County detectives.  (RT 592.)  In light of this evidence,

17  reasonable jurists could have found beyond a reasonable doubt that the evidence was sufficient to

18  support the gang enhancement.

19        Even if Yandell's expert testimony was improperly admitted, such error did not result in

20  Petitioner's trial being fundamentally unfair because it did not have "'a substantial and injurious

21  effect' on the verdict." Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001), quoting Brecht v.

22  Abrahamson, 507 U.S. 619, 623 (1993) (noting that even if there had been constitutional error,

23  error was harmless under the Brecht standard).

24        First, the trial court specifically instructed the jury on how to evaluate the expert opinion

25  testimony by providing CALJIC NO. 332, which stated:

26            Witnesses were allowed to testify as an expert and to give opinions.  You
            must consider the opinions, but you are not required to accept them as true or
27            correct.  The meaning and importance of any opinion are for you to decide.  In
            evaluating the believability of an expert witness, follow the instructions about the
28            believability of witnesses generally.  In addition, consider the expert's knowledge,

skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

An expert witness may be asked a hypothetical question. A *hypothetical question* asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.

If the expert witnesses disagreed with one another, you should weigh each opinion against the others. You should examine the reasons given for each opinion and the facts or other matters on which each witness relied. You may also compare the experts' qualifications.

(CT 383.)

Second, Officer Yandell testified that he reviewed documentation pertaining to two prior offenses by Bulldog gang members which demonstrated a pattern of criminal activity among the gang. (Supp CT 1-17; RT 572-573, 639, 641.) Yandell reviewed documents and case reports from other law enforcement agencies regarding both the incidents, which were commonly relied on by gang experts. (RT 572-574.) The February 16, 2006, incident involved self-admitted gang member Saul Martinez selling drugs while armed with firearms. (RT 573.) Because of this incident, Martinez was convicted of possession of marijuana for sale (Health & Safety Code section 11359). (Supp CT 13.)

Yandall also opined that the crime involving Nelson Mendoza was done in furtherance of the Fresno Bulldog gang activity. (RT 573-574.) In this instance, three admitted and known gang members burglarized a vehicle. Each member had a distinct and separate job and each assisted one another in the commission of the offense which furthered and promoted the criminal gang activity. (RT 573-577.)

The jury necessarily concluded that the current crimes, including kidnapping, robbery, assault with a firearm, and assault with a deadly weapon, supported the "primary activities" element of the gang allegation charge. (CT 433-437.) The evidence at trial included testimony by two witnesses who indicated that Petitioner participated in the robbery. (RT 188-199, 205, 357, 369-402, 477-481.) Petitioner himself admitted to police that he participated in the robbery,

identified himself as the person holding a bat in the store surveillance video, and admitted that he hit Yassen two or three times with the bat.  (RT 157-158, 313, 336-338; CT 588-590, 594-596, 606, 617, 622-624, 627.)  Petitioner also admitted he was a Bulldog gang member and was known by the nickname "Little mini boy."  (CT 592, 606.)  He also wrote an apology note for committing the crime.  (CT 497-498; RT 341-344.)  A search of Petitioner's bedroom revealed $12,000 in cash, a baseball bat, and gang indicia.  (RT 253-273, 301-305.)

Based on the foregoing, Petitioner's challenge to the expert testimony and evidence presented regarding the gang enhancement is without merit, and habeas corpus relief is foreclosed.

IV.   <u>Insufficient Evidence to Support Conviction of Aggravated Kidnapping</u>

Petitioner contends there was insufficient evidence to support his conviction of aggravated kidnapping because the movement was merely incidental to the robbery.

The California Court of Appeal, Fifth Appellate District, issued the last reasoned decision and held as follows:

> As to count I, kidnapping of Yassen to commit robbery (§ 209, subd. (b)), [Petitioner] contends there is insufficient evidence of the asportation element to support his conviction. [Petitioner] argues the robbers' movement of Yassen through the store was only incidental to the robbery itself and that movement did not increase the risk of harm.
>
> "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331, 75 Cal.Rptr.2d 412, 956 P.2d 374.)
>
> The asportation element of kidnapping for the purposes or robbery, also known as aggravated kidnapping, "requires movement of the victim that is [1] not merely incidental to the commission of the underlying crime and [2] that increases the risk of harm to the victim over and above that necessarily present in the underlying crime itself. [Citations.] 'Theses two aspects are not mutually exclusive, but interrelated.' [Citations.]" (*People v. Martinez* (1999) 20 Cal.4th 225, 232-233, 83 Cal.Rptr.2d 533, 973 P.2d 512 (*Martinez*).)  FN 10 "The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement. [Citation.]" (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152, 47 Cal.Rptr.3d 575, 140 P.3d 866.)  "This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment.  Moreover, whether the victim's forced movement was merely incidental to the [underlying felony] is necessarily connected to whether it substantially increased the risk to the victim." (*Ibid.*)  "Although any assessment of the *Daniels/Rayford* test necessarily must include a consideration of the actual distance the victim was forced to move

[citation], we have repeatedly stated no minimum distance is required to satisfy the asportation requirement [citation], so long as the movement is substantial [citation]." (*Ibid*.)

FN 10.  The California Supreme Court previously construed the asportation requirement of aggravated kidnapping to require that the movement of the victim "substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*People v. Daniels* (1969) 71 Cal.2d 1119, 1139, 80 Cal.Rptr. 897, 459 P.2d 225 (*Daniels*), italics added; see also *People v. Rayford* (1994) 9 Cal.4th 1, 12-13, 36 Cal.Rptr.2d 317, 884 P.2d 1369 (*Rayford*).)  "In 1997, the Legislature added to the aggravated kidnapping statute *Rayford's* and *Daniel's* requirement of an 'increase of risk to harm.' [Citation.]" (*People v. Ortiz* (2002) 101Cal.App.4th 410, 414-415, 124 Cal.Rptr.2d 92, italics added.)  The aggravated kidnapping statute "thus codifies both *Rayford* ... and a modified version of the ... *Daniels* ... asportation standard. [Citations.] Unlike our decisional authority, it does not require that the movement 'substantially' increase the risk of harm to the victim. [Citation.]" (*Martinez, supra*, 20 Cal.4th at p.232, fn.4, 83 Cal.Rptr.2d 533, 973 P.2d 512.)  "As such, the movement of the victim in an aggravated kidnapping must increase the risk of harm beyond that inherent to the underlying crime, but 'does not require that the movement "substantially" increase the risk of harm to the victim.' [Citation.]" (*People v. Ortiz, supra*, 101 Cal.App.4th at p.415, 124 Cal.Rptr.2d 92.)

As to the first asportation element, "[i]n determining, 'whether the movement is merely incidental to the [underlying] crime ... the jury considers the "scope and nature" of the movement.  [Citation.] This includes the actual distance a victim is moved.  However, we have observed that there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong.' [Citations.]" (*Martinez, supra*, 20 Cal.4th at p.233, 83 Cal.Rptr.2d 533, 973 P.2d 512, second set of brackets in original.)

The second asportation element "'refers to whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in [the underlying crime]. [Citations.] This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhancement opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased. [Citations.]' [Citations.]" (*Martinez, supra*, 20 Cal.4th at p. 233, 83 Cal.Rptr.2d 533, 973 P.2d 512.)  "The 'risk of harm' test is satisfied when the victim is forced to travel a substantial distance under the threat of imminent injury by a deadly weapon. [Citation.]" (*In re Earley* (1975) 14 Cal.3d 122, 131, 120 Cal.Rptr. 881, 534 P..2d 721.)

[Petitioner's] conviction for aggravated kidnapping is supported by overwhelming evidence.  The robbers' movement of Yassen from the front of the store to the rear storage room was not merely incidental to the robbery.  Yassen was moved within the store itself, but the actual distance was approximately 33 feet, based on the trial evidence.  (*See, e.g., Martinez, supra*, 20 Cal.4th at pp. 230, 237-238, 83 Cal.Rptr.2d 533, 973 P.2d 512 [movement of victim 40 to 50 feet away from house was not necessarily insubstantial].)  While [Petitioner] characterizes the movement as involving a short distance, "relatively short distances have been found not to be incidental where the movement results in a substantial change in 'the context of the environment.' [Citations.]" (*People v. Diaz* (2000) 78 Cal.App.4th 243, 247, 92 Cal.Rptr.2d 682.)  The robbers entered

the store just before closing, when Yassen was alone and his coworker was in the parking lot. They did not demand that Yassen open the registers or give them cash. Instead, they ordered Yassen into the storage area. Even though Yassen did not resist, they dragged him from the front of the store, where someone in the parking lot could have easily seen inside, to the rear storage area, which was secluded from public view. This movement subjected Yassen to a substantial increase in the risk of harm "'above and beyond that inherent in [the underlying crime].' [Citations.]" (*Martinez*, *supra,* 20 Cal.4th at p. 233, 83 Cal.Rptr.2d 533, 973 P.2d 512, brackets in original.)

Once the assailants had Yassen in the back room, they again declined to ask where the money was or demand that he open the safe in the back office. Instead, they beat Yassen unconscious, and the beating was so severe that Yassen suffered repeated seizures after the assault. During his postarrest interview, [Petitioner] admitted he hit Yassen two or three times with the baseball bat, but insisted that he did not want to kill him. After Yassen was beaten, Michael walked past him, and used his injured coworker's regular technique to pry open the office door and get the money.

[Petitioner] cites a series of cases where the movement of robbery victims within business establishments was found insufficient to constitute aggravated kidnapping. In those cases, however, the movement of the victims was accomplished for the robbers to gain access to the cash or property within those businesses. (*See*, *e.g. People v. Hoard* (2002) 103 Cal.App.4th 599, 601-602, 607, 126 Cal.Rptr.2d 855; *People v. Washington* (2005) 127 Cal.App.4th 290, 294, 300, 25 Cal.Rptr.3d 459 [incidental movement of robbery victim from teller area of bank to location of vault]; *In re Crumpton* (1973) 9 Cal.3d 463, 466-467, 106 Cal.Rptr. 770, 507 P.2d 74 [forcible movement of victim 20 to 30 feet behind a truck parked at service station merely incidental to robbery]; *People v. Williams* (1970) 2 Cal.3d 894, 899, 903, 88 Cal.Rptr. 208, 471 P.2d 1008 [insufficient evidence of asportation because movement around a service station and its adjacent outdoor area was similar to movement within a place of business or other enclosure, and necessary to gain access to property].)

As explained in *People v. Diaz*, *supra,* 78 Cal.App.4th 243, 92 Cal.Rptr.2d 682, however, "incidental movements are brief and insubstantial, and frequently consist of movement around the premises where the incident began. [Citations.]" (*Id.* at p. 247, 92 Cal.Rptr.2d 682.) "By contrast, relatively short distances have been found not to be incidental where the movement results in a substantial change in 'the context of the environment.' (*See*, *e.g.*, *People v. Rayford*, *supra,* 9 Cal.4th at p. 23 [36 Cal.Rptr.2d 474, 885 P.2d 887] 105 feet at night from parking lot to less visible location next to wall in adjacent empty lot not incidental to intended rape]; *People v. Jones* (1999) 75 Cal.App.4th 616, 629-630 [25 to 40 feet across a school parking lot and into the victim's own car not incidental to intended robbery, where defendant intended to drive away but victim immediately escaped]; *People v. Salazar* (1995) 33 Cal.App.4th 341, 347 [29 feet from outside motel room door, through the room, and into a bathroom not incidental to intended sexual assault].)" (*People v. Diaz*, *supra*, 78 Cal.App.4th at p. 247, 92 Cal.Rptr.2d 682.)

In this case, the robbers' movement of Yassen from the front of the store to the rear storage area was not an integral part of the robbery because they already knew where the money was and how to get it. As explained in *Martinez* and *Rayford*, the robbers' movement of Yassen from the front of the store into the rear storage area subjected him to a substantial increase in the risk of harm above and beyond that inherent in the robbery itself, because it resulted in a substantial

1   change in the context of the environment, enhanced the danger to the victim, and
    enabled the robbers to commit the assault on Yassen. (*Martinez*, *supra*, 20 Cal.4th
2   at p.233, 83 Cal.Rptr.2d 533, 973 P.2d 512; *Rayford*, *supra*, 9 Cal.4th at pp. 13-14,
    36 Cal.Rptr.2d 317, 884 P.2d 1369.) [Petitioner's] conviction for aggravated
3   kidnapping is supported by substantial evidence.

4   (Resp's Ans., Ex. A 21-25.)

5       Petitioner argues his actions did not amount to movement that was more incidental to the

6   underlying crime nor did his actions increase the risk of harm to the victim.  The Court of Appeal

7   interpreted California law to the contrary, and such determination is binding upon a federal court

8   reviewing a petition for habeas corpus.  See Jackson, 443 U.S. at 324 n. 16; Bradshaw v. Richey,

9   546 U.S. 74, 76 (2005) (per curiam) ("We have repeatedly held that a state court's interpretation

10  of state court's interpretation of state law, including one announced on direct appeal of the

11  challenged conviction, binds a federal court sitting in habeas corpus." (citations omitted)); Estelle

12  v. McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to

13  reexamine state-court determinations on state-law questions").

14      Interpreting California law, the Court of Appeal determined that the jury must consider the

15  scope and nature of the movement to determine if it was merely incidental to the underlying

16  crime.  Such determination includes the actual distance the victim is moved, but there is no

17  minimum number of feet a victim must be moved.  The jury must also consider whether the

18  movement subjected the victim to a substantial increase in risk of harm above and beyond that

19  inherent in the underlying crime.  Such factors include the decreased likelihood of detection,

20  danger inherent in the victim's foreseeble attempts to escape, and the defendant's increase in

21  opportunity to commit additional crimes.

22      The victim testified at trial regarding the incident and described for the jury how Petitioner

23  and his accomplices moved him from the front of the store to the rear storage area, and the state

24  appellate court reasonably determined such movement was not an integral part of the robbery and

25  subjected the victim to a substantial increase in risk of harm above and beyond that inherent in the

26  robbery itself.  Yassen was forced by the robbers to move thirty-three feet from the front of the

27  store where  a large portion of the windows were located to the back hallway area which was not

28  exposed to the public.  The area was dimly lit with only one small high window and was not

within the view of the front door or register area.  Yassen was immediately threatened at gun point

and ordered to get down on the floor-which he did without resistance.  Petitioner then beat him

with a baseball bat and left him lying in a pool of blood.  There was no need to move the victim

from the front of the store to the back because Michael had worked at the store and knew how to

open the door, and the door was opened and money was taken without any assistance by Yassen.

Based on the evidence above, the jury could rationally infer that Yassen's movement within the

store was not incidental to the robbery and such movement substantially increased his risk of harm

far and above that inherent in the robbery.  Petitioner fails to meet his heavy burden to warrant

granting federal habeas relief based on the lack of sufficient evidence to support his conviction.

V.     Prejudicial Testimony by Gang Expert

Petitioner contends that the gang expert made numerous prejudicial comments during his

testimony which resulted in a violation of his due process rights.  The California Court of Appeal,

Fifth Appellate District denied the claim in the last reasoned decision, stating:

> [Petitioner] next contends that even if Detective Yandell's testimony was
> properly admitted on the elements of the gang enhancements, he improperly
> offered his opinion about the character of gang members, in general, and defendant
> in particular. [Petitioner] argues Yandell improperly testified that gang members
> are liars, and they do not lead normal and productive lives. [Petitioner] further
> argues such testimony was prejudicial to defendant and fatally undermined the
> credibility of his trial testimony–that he was not involved in the robbery.

A. Background

> [Petitioner's] arguments on these points are based on several different
> sequences from Yandell's testimony.  On direct examination, Yandell testified
> about his discovery of gang-related paraphernalia when he had executed search
> warrants in other gang cases.  The prosecutor asked if the subjects of the warrants
> admitted the gang materials belonged to them.  Yandell replied: "[W]hen you get
> into gang members, they're a lying breed.  They don't like to tell the truth, and–."
> (Italics added.)  Defense counsel objected under Evidence Code section 352.  The
> court overruled [the] objection and Yandell continued with his answer:
>
> "In my experience with the gang members I have dealt with and I have
> talked to, a very, very slim percentage will actually tell you the truth.  Most will lie.
> [¶] So to answer your question, some admit to it, some won't. [Gang
> paraphernalia] will be on their bed, under their cell phone, in their wallet, I don't
> know how it got there."  (Italics added.)
>
> Defense counsel later conducted voir dire about Yandell's expertise, and
> counsel asked whether Yandell believed all gang members were liars.  Yandell
> explained: "I believe I stated as a generalization all gang members," and that they
> may lie to law enforcement officers about "the classification of the actual

membership of the gang."  Yandell further explained:

"People lie.  I mean, especially as a law enforcement officer, people lie to you repeatedly, so I'm not gonna–my answer to the earlier question was my generalization from my experience is that gang members lie as a general–as a generalization about their membership or association thereof."  (Italics added.)

As for the lifestyle of gang members, the prosecutor asked Yandell how the robbery of $160,000 would benefit a gang.  Yandell testified:

"[The u]ltimate goal of any gang is to gain money so that can further their criminal lifestyle.  They don't like to work and hold jobs.  They do–I mean, all gangs have illegal activities.  That's why they do.  So if they go and steal money, then they've got money to continue their criminal patterns."  (Italics added.)

Defense counsel objected under Evidence Code section 352.  The court overruled the objection.  Yandell later returned to this topic when asked how gangs deal with "snitches" and "rats."

"[Y]ou will be dealt with in a very swift and efficient manner given the opportunity. [¶]  Normal–and agin, I keep referring to gang culture because they don't live a normal lifestyle like we do.  They don't pay taxes, mow their lawns or wave at neighbors.  They rob and steal and hit people on the heads with bats and so on and so forth...."  (Italics added.)

Defense counsel raised a foundation objection "to the statements about what they do."  The court overruled the objection.

B. Analysis

[Petitioner] contends that Yandell's testimony on these points constituted inadmissible character evidence. [Petitioner] further contends the evidence was prejudicial and requires reversal of his convictions because Yandell's opinion about the lifestyle of gang members undermined the credibility of defendant's trial testimony-that he was not involved in the kidnapping and robbery.

We begin with the parameters of character evidence in gang cases. "[E]vidence of a person's character of a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).)  Evidence Code section 1101's subdivision (b) clarifies this general rule:

"Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

"Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.] Such evidence is only admissible when it is logically relevant to some material issue at trial other

than character trait evidence. [Citation.]"  (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449, 69 Cal.Rptr.2d 16.)

However, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense.  Evidence of the defendant's gang affiliation–including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, and the like–can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*Hernandez*, supra, 33 Cal.4th at p. 1049, 16 Cal.Rptr.3d 880, 94 P.3d 1080.)

"Evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony. [Citation.] 'Case law holds that where evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial. [Citations.]' [Citation.]" (*People v. Martinez* (2003) 113 Cal.App.4th 400, 413-414, 7 Cal.Rptr.3d 49.)  "[E]vidence of gang membership has been admitted to prove bias, provided it is not cumulative to other properly admitted, and less inflammatory, evidence. [Citations.] Evidence of a relationship between a witness and a party is logically relevant to show bias. [Citation.]" (*People v. Ruiz* (1998) 62 Cal.App.4th 234, 240, 72 Cal.Rptr.2d 572.) An expert's testimony "about what it meant to be a 'rat' in gang culture" may be relevant "to help the jury understand discrepancies between some of the witnesses' statements to the police and their testimony at trial," and for the jury to evaluate the witness's credibility. (*People v. Martinez*, *supra*, 113 Cal.App.4th at pp. 413-414, 7 Cal.Rptr.3d 49.)  An expert may also testify about motive and intent in gang cases.  (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518, 28 Cal.Rptr.2d 758.)

The court's evidentiary rulings under Evidence Code sections 1101 and 352 are reviewed for an abuse of discretion.  (*People v. Mungia* (2008) 44 Cal.4th 1101, 1130, 81 Cal.Rptr.3d 614, 189 P.3d 880; *Olguin*, *supra*, 31 Cal.App.4th at p. 1369, 37 Cal.Rptr.2d 596.)

[Petitioner] relies on the sequences from Yandell's testimony, as quoted ante, and argues that Yandell's assertions that gang members lie and lead criminal lifestyles undermined the credibility of [Petitioner's] trial testimony that he was not involved in the robbery.  However, Yandell never testified to his opinion about [Petitioner's] character or reputation.  Instead, he described the motives and biases of gang members based on his expertise about gang psychology and sociology in general.

In any event, we need not decide whether the court should have excluded Yandell's testimony on these points, because any error was harmless since Yandell's testimony did not undermine the credibility of [Petitioner's] trial claim that he was not involved in the robbery.  (*See*, *e.g.*, *People v. Mungia*, *supra*, 44 Cal.4th at p. 1131, 81 Cal.Rptr.3d 614, 189 P.3d 880.)  Michael and Felecia testified that [Petitioner] participated in the planning and execution of the robbery, the officers found thousands of dollars in [Petitioner's] bedroom, [Petitioner] admitted during his postarrest interview that he was at the store and hit the clerk in the head with a baseball bat, [Petitioner] identified himself in an image from the store's surveillance videotape, [Petitioner] drafted a letter of apology to the clerk for inflicting the grievous head injuries, and [Petitioner] admitted the money in his bedroom was from the robbery.  "In short, the evidence of [Petitioner's] guilt was overwhelming," and any error in admitting the purported character evidence "did not prejudice defendant." (*Id*. at p. 1132, 81 Cal.Rptr.3d 614, 189 P.3d 880.)

37

(Resp's Ans., Ex. A at 43-47.)

Under California law, expert testimony on criminal street gangs is admissible to prove the elements of the criminal street gang enhancement.  See People v. Hernandez, 33 Cal.4th 1040, 1047-1048 (2004) ("In order to prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs."). Additionally, "an expert may render opinion testimony on the basis of facts given in a hypothetical question that asks the expert to assume the truth.  People v. Gardeley, 14 Cal.4th 605, 618 (1996) (internal quotation marks omitted).

As an initial matter, federal courts "do not review questions of state evidence law." Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see also Lewis v. Jeffers, 497 U.S. 764, 780 (1990). "[F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief.  While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated."  Jammal, 926 F.2d 919.  Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871, 874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), cert. denied, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990).

Here, Detective Yandell's discussion of gang psychology and culture did not result in a deprivation of Petitioner's right to due process or a fair trial.  Yandell indicated that gang members in general lie to law enforcement about their gang membership.  Yandell never stated that Petitioner lied about his gang membership.  Officer Yandell also responded to the prosecution's hypothetical that the ultimate goal of any gang is to gain money for them to further and promote their criminal activity.  In a situation where a large sum of money is obtained, such as $160,000, it affords the gang a lot of money to buy guns, clothing, cars, etc. to further assist in their illegal activities.  (RT 552-553.)  Yandell also testified to the fact that snitching or ratting on fellow gang members is disfavored among the gang culture and if you talk to police you will be

38

1   dealt with in a very swift and efficient manner.  (RT 559.)

2        The California Court of Appeal reasonably noted that Yandell never gave his opinion

3   regarding Petitioner's character or reputation, but rather he explained the motives and biases of

4   gang members in general based on his experience and expertise.  The Court then concluded, it

5   "need not decide whether the court should have excluded Yandell's testimony on these points,

6   because any error was harmless since Yandell's testimony did not undermine the credibility of

7   defendant's trial claim that he was not involved in the robbery."  (Ex. A at 46-47.)

8        Although the California Court of Appeal did not reach the issue of whether the alleged bad

9   character evidence was improperly admitted, even under a de novo review the claim is without

10  merit.  If the state court does not adjudicate a portion of a petitioner's federal claim, that portion

11  of the claim is reviewed de novo in this Court.  Wiggins v. Smith, 539 U.S. 510, 534 (2003) ("our

12  review is not circumscribed by a state court conclusion with respect to prejudice, as neither the

13  state courts below reached this prong of the *Strickland* analysis.").[2]

14       Petitioner cites Garceau v. Woodford, 275 F.3d 769, 773 (9th Cir. 2001), rev'd on other

15  ground by Woodford v. Garceau, 538 U.S. 202 (2003) and McKinney v. Rees, 993 F.2d 1378,

16  1384 (9th Cir. 1993) and argues the admission of the character evidence violated his constitutional

17  right against conviction based on bad character evidence.  Respondent correctly notes that neither

18  case deals with the admission of gang expert testimony regarding the psychology and culture of

19  gangs.  As previously stated, California law specifically allows for an expert to provide testimony

20  regarding the culture, habits and psychology of gangs, including information about gang

21  membership, dress, hand signals, graffiti, territory, and retaliatory practices.  Officer Yandell's

22  testimony about the gang lifestyle and internal loyalties was relevant for the jury to assess the bias

23  and credibility of witnesses who were gang associates.  See e.g. People v. Ruiz, 62 Cal.App.4th

24  ⎯⎯⎯⎯⎯⎯⎯⎯⎯

25       [2] In Harrington v. Richter, 131 S.Ct. 770 (2011), the Supreme Court raised doubt as to whether the
    reasoning in Wiggins and Rompilla remains valid by stating that AEDPA deference applies:  '[W]hether or not the
26  state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a
    "claim," not a component of one, has been adjudicated'.  However, the Ninth Circuit has continued to follow the
27  reasoning in Wiggins and Rompilla.  Regardless of whether review is de novo or deferential under AEDPA, for the
    reasons explained here, in the result would be the same.  See Berghuis v. Thompkins, -- U.S. --, 130 S.Ct. 2250, 176
28  L.Ed.2d 1098 (2010) (If a state court decision is correct under de novo review, then it is necessarily reasonable
    under the more deferential AEDPA standard of review pursuant to 28 U.S.C. § 2254(d).).

1 | 234, 240-241 (1998); <u>People v. Gardeley</u>, 14 Cal.4th at 617 (a police officer with sufficient

2 | expertise on gang may testify regarding gang sociology and psychology to assist the jury in

3 | evaluating witnesses' credibility); <u>People v. Martinez</u>, 113 Cal.App.4th 400, 413-414 (2003)

4 | (expert's testimony about what it meant to be a "rat" in gang culture was relevant to help the jury

5 | understand discrepancies between some of the witnesses' statements to the police and their

6 | testimony at trial).)

7 |        At the close of the trial, the court instructed the jury regarding the limited purpose of the

8 | evidence of gang activity:

9 |        You may consider evidence of gang activity only for the limited purpose of
deciding whether:

10 |

11 |        The defendant acted with intent, purpose, and knowledge that are required
to prove the gang-related crimes and enhancements

12 |        OR

13 |        The defendant had a motive to commit the crimes charged;

14 |        You may also consider this evidence when you evaluate the credibility or
believability of a witness and when you consider the facts and information relied

15 | on by an expert witness in reaching his opinion.

16 |        You may not consider this evidence for any other purpose.  You may not
conclude from this evidence that the defendant is a person of bad character or that

17 | he has a disposition to commit crime.

18 | (CT 421; CALJIC 1403.)

19 | Where the trial court properly instructs the jury that it is not permitted to consider gang evidence

20 | to prove that the accused had a bad character or was predisposed to commit a crime, it will be

21 | presumed the jury follows the court's instruction in the absence of any showing to the contrary.

22 | <u>People v. Williams</u>, 170 Cal.App.4th 587, 613 (2009) (citing <u>People v. Yeoman</u>, 31 Cal.4th 93,

23 | 139 (2003); <u>see also</u> <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000).  Here, Petitioner has made no

24 | showing that the jury did not follow this instruction.  Moreover, there is no "clear ruling that

25 | admission of irrelevant or overtly prejudicial evidence constitutes a due process violation

26 | sufficient to warrant issuance of the writ."  <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir.

27 | 2009).  In <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991), the Supreme Court expressly refused to

28 | determine whether the introduction of bad character evidence in the form of prior crimes to show

1 | propensity to commit a crime would violate the Due Process Clause.  Id. at 75 n.5; see also Mejia

2 | v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008) (holding that state court had not acted objectively

3 | unreasonable in determining that the propensity evidence introduced against the defendant did not

4 | violate his right to due process).  Absent any clearly established law, Petitioner is not entitled to

5 | habeas corpus relief.  Id.

6 | Even under de novo review the admission of the challenged evidence did not render

7 | Petitioner's trial fundamentally unfair.  The evidence presented at trial against Petitioner was

8 | strong.  Yassen testified that he was hit with a baseball bat and the next thing he remembered was

9 | laying in a puddle of blood disoriented.  (RT 95-96, 100-101.)  Two other witnesses, Felicia

10 | Hernandez and Michael Santoyo, indicated that Petitioner participated in the robbery.  (RT 188-

11 | 199, 205, 357, 369-402, 477-481.)  Petitioner also admitted to the police that he participated in the

12 | robbery, identified himself in the surveillance video as the person holding a bat, and admitted he

13 | hit Yassen two or three times with a bat.  (RT 157-158, 313, 336-338; CT 588-590, 594-596, 606,

14 | 617, 622-624, 627.)  Petitioner conceded that he was a Bulldog gang member and was known by

15 | the nickname "Little mini boy."  (CT 592, 606.)  Petitioner also wrote an apology note expressing

16 | sympathy for committing the crime.  (CT 497-498; RT 341-344.)  During a search of Petitioner's

17 | bedroom, officers recovered $12,000 in cash, a baseball bat, and gang indicia.  (RT 252-273, 301-

18 | 305.)  Accordingly, given the strong evidence against Petitioner at trial, the admission of the

19 | alleged bad character evidence could not and did not render his trial fundamentally unfair, and

20 | Petitioner's claim to the contrary fails on the merits.

## RECOMMENDATION

21 |

22 | Based on the foregoing, it is HEREBY RECOMMENDED that:

23 | 1.      The instant petition for writ of habeas corpus be DENIED; and

24 | 2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

25 | This Findings and Recommendation is submitted to the assigned United States District

26 | Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the

27 | Local Rules of Practice for the United States District Court, Eastern District of California.  Within

28 | thirty (30) days after being served with a copy, any party may file written objections with the court

and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate

Judge's Findings and Recommendation."  Replies to the objections shall be served and filed

within fourteen (14) days after service of the objections.  The Court will then review the

Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that

failure to file objections within the specified time may waive the right to appeal the District

Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:**   **December 6, 2012**           /s/ **Barbara A. McAuliffe**
UNITED STATES MAGISTRATE JUDGE